IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

**DR. ALLAN L. BERGANO, D.D.S., P.C. and
DR. ALLAN L. BERGANO, D.D.S.,**

**Plaintiffs,**

v.                                                    **Civil Action No. 2:15cv520**

**CITY of VIRGINIA BEACH,
GAIL E. SALMONS, and
PHILIP A. DAVENPORT,**

**Defendants.**

## ORDER

This matter is before the Court following a bench trial held February 7, 2017 through February 9, 2017 at which Plaintiffs Dr. Allan L. Bergano, D.D.S. ("Dr. Bergano") and Dr. Allan L. Bergano, D.D.S., P.C. ("Plaintiffs") and Defendants City of Virginia Beach ("City"), Gail E. Salmons, and Phillip A. Davenport ("Defendants") presented evidence and argument. After the trial, the Court **FOUND** the City liable to Plaintiffs. The Court instructed the Parties to submit briefs for the Court to consider in ruling on damages, including whether Plaintiffs are entitled to attorneys' fees. These findings of fact and conclusions of law explain the Court's reasoning as to liability.

## I.       FINDINGS OF FACT

### A.       The City's Acquisition of the Witchduck building

Plaintiffs are a dental practice and a dentist. Defendant Salmons is a Right of Way Agent for the City, and Defendant Davenport is the Director of Public Works for the City. Dr. Bergano operated a dental practice at 256 North Witchduck Road, Virginia Beach, Virginia for over thirty

1

(30) years and served approximately 2,000 patients. For that entire period, Dr. Bergano leased office space in the Witchduck Office Court building owned by Jerry Collier ("the Witchduck building"). The Parties agreed that Mr. Collier and Dr. Bergano maintained an excellent landlord-tenant relationship. By 2014, Dr. Bergano leased approximately 1,350 square feet of space in the Witchduck building.

The Witchduck building is bounded by North Witchduck Road, a heavily trafficked thoroughfare; Admiral Wright Road; and Jersey Avenue. Curb cuts into the parking lot provide visitors with access points from each road. In early 2014, Dr. Bergano's wife, an employee at the dental practice, attended a public meeting on the City's proposed project ("the Project") to widen Witchduck Road, the heavily trafficked thoroughfare. At the meeting, Mrs. Bergano learned that the City's construction plans would eliminate parking spaces around the Witchduck building, limit direct access from the property to North Witchduck Road, and convert the adjoining Admiral Wright Road into a cul-de-sac. The Project received federal and state funding. See Def. Ex. 3.

In the spring of 2014, James Lawson, a City real estate agent, learned that the City planned to purchase a portion of the Witchduck building property to facilitate its widening project. Mr. Lawson approached City Council with the City's plan to purchase the property. David Hansen, then a deputy City Manager, discussed the property purchase with Mr. Lawson, and they concluded that the City would use the Witchduck building to house other City offices and personnel. Pl. Ex. 20. In fact, evidence at trial established that by July 17, 2014, Mr. Hansen and the City had purposed to let Plaintiffs continue leasing space in the building for the foreseeable future. Mr. Hansen testified, "[I]t was clear to me that we did not need that space."

Mr. Lawson arranged for two (2) appraisals of the portion of the property the City planned to purchase. The first appraisal was approximately $78,000. However, Mr. Lawson recognized that the City's Project would eliminate up to eighteen (18) parking spaces around the Witchduck building and potentially incentivize drivers to cut through the property as a shortcut to North Witchduck Road. He raised these concerns with the appraiser, and the appraiser reevaluated the damage to the residue of property at over $601,000. Pl. Ex. 20. Mr. Lawson then met with Defendant Davenport, and the City decided to acquire the entire Collier property rather than a portion because the damage to the residue would equal a large percentage of its entire value. The City offered to purchase the entire Witchduck building property in the spring of 2014. At trial, the Court additionally **FOUND** that while the City was negotiating the purchase of the Witchduck building, the City instructed Mr. Collier not to extend existing leases or negotiate new leases with tenants. In exchange, the City paid him additional monies corresponding to the rent payments he would have received had he retained two other tenants and acquired an additional tenant. See Pl. Ex. 11. Mr. Collier closed on the purchase of the entire Collier property by the City on September 9, 2014.

At trial, Mr. Lawson testified that the City policy was to inform tenants that the City had purchased their landlords' property only after the sales were completed because this practice prevented tenants from prematurely ending their leases. However, in July 2014, before the City purchased the Collier property, Mr. Lawson informed its only tenant, Dr. Bergano, that the City would purchase the Witchduck building. At Deputy City Manager Hansen's direction, Mr. Lawson told Dr. Bergano that he would need to relocate his dental practice because the City would be using the entire property. Mr. Lawson communicated the implication of the Project to Dr. Bergano and informed him that the City could execute a new month to month lease with him

before he would have to relocate. Mr. Lawson retired at the end of 2014, and Defendant Salmons replaced him as the City's relocation liaison officer to Plaintiffs.

Dr. Bergano testified that the City informed him of its acquisition of the Witchduck building and required him to sign a new month to month "Possession Agreement"[1] with the City within ten (10) days or forfeit his relocation benefits. On September 9, 2014, though it restricted his rights compared to his previous lease, Dr. Bergano entered into a Possession Agreement ("PA") with the City. Pl. Ex. 5. The PA allowed Plaintiffs to "stay in the Premises pending relocation . . . for a period of twelve months, beginning on September 9, 2014, and ending no later than September 15, 2015." Id., ¶ C. Dr. Bergano understood that he needed to relocate his practice by September 15, 2015 and accordingly began searching for a new practice location. On September 15, 2014, Defendant Salmons delivered a letter and attachments to Dr. Bergano at his practice. Def. Ex. 48. The letter indicated that Plaintiffs were eligible for relocation benefits, and the attachments included the City's Business Relocation Assistance brochure, which contained information about benefit options as well as information concerning appeal rights from an adverse decision by a city official. Id.; see Pl. Ex. 6.

**B.    The Change of the Witchduck Building**

In August 2015, the City relocated five (5) divisions of its Human Services Department ("HSD") to the Witchduck building. Dr. Bergano testified that the presence of his new cotenants "created a very toxic environment:" all HSD office doors were locked; a security guard monitored the building twenty-four (24) hours a day; inmates in orange jumpsuits assisted in moving the HSD offices into the building, Def. Exs. 102, 112, 114, 119, 126, 127, 138;[2] inmates

---

[1] The City's position was to distinguish the "Possession Agreement" from a month to month lease as the term lease in itself might potentially confer additional rights to the occupant/tenant.

[2] The City presented internally conflicting evidence as to whether inmates in orange jumpsuits also performed landscaping work at the Witchduck building.

in orange jumpsuits escorted by guards visited the building for periodic evaluations; and the City posted a "Police Parking Only" sign reserving a parking space for City police cars. Pl. Exs. 16, 17. The security guard once harassed a young African American male dental patient and even once questioned Dr. Bergano why he was present at the building. Dr. Bergano indicated that HSD clients often entered his offices to ask for directions to the HSD offices because Dr. Bergano's door was the only unlocked door, and if the practice provided unsatisfactory answers, some clients became angry. Dr. Bergano testified that he "felt like a hostage," and his staff and patients felt threatened. HSD clients also slept overnight in the Witchduck building parking lot, and the increased activity at the building made parking difficult for his patients and staff. Dr. Bergano testified that his lease with Mr. Collier had reserved eight (8) parking spaces for the dental practice, and when he complained to the City about the parking difficulties after HSD's move, the City reserved only four (4) spaces for the dental practice although he and his staff alone needed five spaces.

**C.    Plaintiffs' Search for a New Location and the City's Denial of Relocation Benefits**

Dr. Bergano testified that Defendant Salmons instructed him that he would receive relocation benefits only if he submitted to the City a signed lease for a new property, bids for the necessary modifications or "build-out" of the property, and bids for any new required dental equipment. Evidence at trial indicated that Defendant Salmons repeatedly encouraged Plaintiffs to keep the City informed about their progress and expenses during their relocation search process. Def. Ex. 81.

Therefore, Plaintiffs hired commercial real estate broker John Wessling to search for a new dental practice location. After a few months of unsuccessful searching, during which Plaintiffs suffered fire damage to their home, Plaintiffs hired another broker, Robert Carter, who

was recommended by a physician friend. Mr. Carter and Plaintiffs examined various properties, visited approximately seven (7), and eventually chose 4460 Corporation Lane, Virginia Beach, Virginia. Mr. Carter testified that access was an important concern in locating a suitable property, as was parking. The Corporation Lane suite was previously used as a general medical practitioner's office and needed substantial renovations to make it suitable for a dental office. Dr. Bergano and Mr. Carter testified to the precise arrangement of dental operatories required to ensure a dentist's mobility while preventing physical strain on the dentist and patient and staff comfort. The Corporation Lane office space had been partitioned for a group of different offices and had unsuitable flooring, electrical work, plumbing, and HVAC facilities. At the trial, the Court **FOUND** that the space had to be reduced to "shell" condition because it was necessary to virtually gut the space in order to properly rebuild it for a dental practice. On July 27, 2015, after months of searching, Plaintiffs signed a ten-year lease for approximately 2,511 square feet of space in the Corporation Lane property, Pl. Ex. 8, with approximately 2,200 square feet of usable space. The lease parties agreed that Plaintiffs would have until August 31, 2015 to secure funding from the City or other sources to modify the space for the dental practice. Id. For eight (8) months, Plaintiffs paid rent for both the Witchduck building and the Corporation Lane property. At the trial, the Court **FOUND** that Plaintiffs did not breach the Corporation Lane property lease. The City made the curious argument that the Plaintiffs had breached the contract by failing to provide written evidence of their financial ability to perform the lease and therefore the Plaintiffs had not secured the binding lease necessary to become eligible for relocation benefits. In other words, the City argued the Plaintiffs breached the lease as an excuse for the City to deny them relocation benefits, although the City was not a party to the lease. The City, having subpoenaed but not called the landlord at Corporation Lane to testify, presented no

6

evidence that the landlord found the lease breached although the written evidence of financial ability from Plaintiffs was never forthcoming. In fact all of the evidence in the case established that the Plaintiffs performed the lease by completing the build out, occupying the new office suite, and paying the rent beginning in June 2016 until the trial. The Court rejected this argument by the City.

On July 27, 2015, Plaintiffs' counsel wrote a letter to Defendant Salmons notifying the City that Plaintiffs had signed a lease for the Corporation Lane property, which was in "shell" condition. Def. Ex. 89. In early August 2015, Plaintiffs submitted bids for modifications to Defendant Salmons for her approval and selection. Defendant Salmons subsequently visited the Corporation Lane space and considered the proposed renovations. Def. Ex. 90. Defendant Salmons testified that the City awards displaced businesses up to $25,000 for reestablishment expenses such as advertising, painting and carpeting, an amount in addition to any building and moving expenses due. On August 5, 2017, Defendant Salmons emailed Plaintiffs' counsel and Plaintiffs to inform them that "the City of Virginia Beach will not approve the expense to build out the location at 4460 Corporation Lane, Suite 190 as proposed." Id. She stated that "it was apparent that the location would accommodate the dental practice with minor modifications and exceeds what the dental [practice] currently occupies." Id. At trial, the Court **FOUND** that the existing suite required major modifications and that the costs of the modification and the addition work necessary to bring it up to code were reasonable and in line with the two estimates that were previously supplied to the City, as long as it was adjusted to reflect the expansion of the number of operatories.

On August 12, 2015, Plaintiffs' counsel wrote to Defendant Salmons memorializing an in-person meeting about Plaintiffs' relocation assistance requests and informing her that "the

7

firm will be appealing the City's decision regarding the build out costs of the Berganos' new office and relocation costs." Def. Ex. 100. On August 19, 2015, Plaintiffs' counsel wrote to a City real estate agent and Defendant Salmons to "request a date for the Bergano's [sic] appeal" and urged a speedy response as "time [was] of the essence." Pl. Ex. 10.

## D.     The City's Relocation Reversal

On August 20, 2015, the day after Plaintiffs filed their formal request for appeal, Defendant Davenport sent Plaintiffs a letter reversing the City's decision that the dental practice needed to relocate. The letter made no mention of the City's decision contesting the amount of relocation expenses or Plaintiffs' right to appeal either of the two conflicting decisions. Def. Ex. 111. It stated, "[t]he City has now determined that the subject property will no longer be needed exclusively for City offices; consequently your client will not be required to relocate." Id. (emphasis added). The letter offered to reimburse Plaintiffs for "any expenses incurred to satisfy any contractual relocation obligations entered into after the effective date of the notice of relocation eligibility." Id. However, the City now argues that the Plaintiffs could have avoided their lease obligation by breaching their lease.

In fact, the decisions that Dr. Bergano's suite was not needed by the City had been made more than thirteen (13) months earlier when the City, through Deputy City Manager Hansen, reached the decision to buy the Witchduck Building, the closing on which did not occur until September 2014. Pl. Ex. 17. However, Deputy City Manager Hansen's decision was never conveyed to Dr. Bergano until the arrival of the August 20, 2015 letter signed by Defendant Davenport. Based upon the testimony in the trial, the exhibits and the Court's inference that Davenport's testimony would have been unfavorable, see infra Part I.F, the Court infers that Davenport would have disclosed that the August 20, 2015 letter was not a recent decision but

rather a restatement of Hansen's July 17, 2014 email which other involved city officials either ignored or overlooked. Clearly the City acted arbitrarily and capriciously. On September 9, 2014, Deputy City Manager Hansen signed the Possession Agreement ("PA") on behalf of the City, which PA said that Dr. Bergano "has been permitted to stay in the Premises pending relocation." Pl. Ex. 5, ¶ B (emphasis added).

Defendant Salmons testified at trial that Plaintiffs never received a hearing after they requested an appeal. Defendants attempted to lay the groundwork to suggest that they considered the settlement conference between Plaintiffs' counsel and City officials to be hearings. However, Mr. Hansen also testified that Plaintiffs never received notice of a date or time or place to appeal the City's denial of relocation benefits. The evidence establishes that the Plaintiffs never received notice of an appeal of the City's determination that they no longer qualified as "displaced persons" eligible for relocations benefits. The Court **FOUND** that the City failed to provide notice to Plaintiffs and failed to provide initial hearings or an appeal of such hearings, which conduct is part of the Court's finding that the City acted arbitrarily and capriciously.

Defendants argued at trial that Plaintiffs had not moved to the Corporation Lane property by the time the City reversed its relocation determination, and Plaintiffs were therefore not "displaced persons." See Va. Code § 25.1-400. The Court did not accept this argument and **FOUND** that Dr. Bergano and his corporate practice entity were displaced persons. In June 2016, Dr. Bergano completed the removal of his dental practice to 4460 Corporation Lane. Evidence at trial established that the City paid Dr. Bergano $2,500 to cover Mr. Carter's relocation expert fees and $2,500 for one (1) month's rent at the Corporation Lane property while Plaintiffs and the City continued negotiations for the monthly period.

E.     **Comparison of Witchduck Building to Other Locations**

Defendants introduced expert testimony concerning the suitability of and access to the Witchduck building after the City's acquisition and upon completion of the project.  Defendants' experts, real estate appraiser Thomas Tye and commercial real estate broker Peter Abraham, testified that the Witchduck building was appropriate for Plaintiffs' dental practice and comparable to the Corporation Lane property into which it relocated.  For example, they testified that Virginia Beach dentists—including Plaintiffs—can comfortably share their tenant space with counseling and mental health providers.  Plaintiffs previously shared the Witchduck building with Tidewater Psychotherapy, which provided mental health evaluations and services, including for prison inmates.  In addition, Plaintiffs shared the Witchduck building with the City's HSD, which they opine provided similar services.  The experts equated these mental health providers to Plaintiffs' current Corporation Lane cotenant, Christian Psychotherapy, a counseling and mental health center which treats inmates who enter through a back entrance and are discreetly led to its offices.[3]  Finally, the experts drew a comparison between a dental office which shared space in another Virginia Beach office space in the Pembroke area with HSD offices before some of those HSD personnel were relocated to the Witchduck building.  Mr. Abraham interviewed a security guard who advised him that he had observed no incidents at Witchduck, however, there were multiple security issues including apparently another security guard harassing a black patient of Dr. Bergano's as well as accosting Dr. Bergano himself.  Also, he did not mention the "police only" parking sign and the multiple instances of HSD patients entering Dr. Bergan's office, sometimes with very unpleasant consequences for Dr. Bergano's

---

[3] The Court notes that Christian Psychotherapy moved into the Corporation Lane property in December 2015. Plaintiffs had signed their Corporation Lane lease in July 2015, before they knew that Christian Psychotherapy would also move into the Corporation Lane property.

staff.[4] Defendants indicated that Plaintiffs' tenant mix in its old and new locations is similar and the HSD presence at the Witchduck building could not have made the location unsuitable for a dental practice. Mr. Abraham relied upon the fact that HSD shared a building in the Pembroke area with a dentist. However, the HSD presence at Witchduck combined HSD offices from five (5) different locations throughout the City, each of which performed a different function involving different patient interaction and is therefore not a valid comparison

Mr. Abraham also examined the surrounding neighborhoods, demographics, and access points of Plaintiffs' former and current office locations. Def. Exs. 197, 198, 200, 201, 202A–C. He stated that the locations are similar, and are both "very good" for a dental practice, though the Corporation Lane property is of a slightly better quality and has better amenities in the immediate area. As for access, Mr. Abraham opined on direct examination that the completed Project will make access to the Witchduck building not "ideal" because the closing of the North Witchduck Road curb cut and the cul-de-sac at Admiral Wright Road will necessitate making several turns to enter the parking lot. However, access to Witchduck will still be "good," he further opined.

## F.    Weight of Expert Witness Testimony

The Court found some witnesses persuasive and discounted the testimony of others. The Court discounted the testimony of Defendants' expert, Thomas Tye, as it was neither well grounded nor impartial. The Court considered Defendants' expert, Peter Abraham, to be impartial, but his opinions did not account for the entirety of the evidence. For example, Mr. Abraham testified that the tenant mix of the Witchduck building and access of the Witchduck building before and after the Project will be acceptable for a dental practice. However, it is

---

[4] All HSD entrances at Witchduck are kept locked leaving security, when present, and Dr. Bergano's office the only sources of information and guidance.

apparent that the City's acquisition of the Witchduck building interfered with the access to the property. Additionally, the Court concluded that Mr. Abraham was unaware of the security guard's harassing Dr. Bergano and at least one dental patient, and these events affect the suitability of the Witchduck building. The presence of inmates at the building for moving or landscaping also certainly had some impact on the character of the property, even if minor. No evidence was presented that the inmates entered the Witchduck building through a back entrance as they do at the Corporation Lane property. As noted supra, Mr. Abraham did not consider the very different experience Dr. Bergano had with HSD as opposed to the private mental counseling offices at both his old Witchduck and new Corporation Lane offices. Mr. Abraham also seemed to be unaware of the "Police Parking Only" sign at the Witchduck building, which is unusual and disconcerting for a professional office property. Ultimately, the Court **FOUND** that the Witchduck building's tenant mix after HSD's occupancy was unsuitable for a dental practice, and its elimination of access was or would become detrimental to Plaintiffs.

The Court noted that Defendant Davenport did not testify, though he was present in the courtroom throughout the trial. The Court therefore drew the inference that his testimony would harm Defendants. It is well settled that a party's "failure to testify as to facts material to his case and as to which he has especially full knowledge creates an inference that he refrained from . . . testifying because the truth, if made to appear, would not aid his contention." Scott v. Watsontown Trucking Co. Inc., 920 F. Supp. 2d 644, 654 (E.D. Va. 2013) (quoting Gray v. Great Am. Recreation Assoc., Inc., 970 F.2d 1081, 1082 (2d Cir. 1992)). The Court infers from Mr. Davenport's failure to testify, from Deputy City Manager Hansen's memo of July 17, 2014[5] and from the other evidence in the case that Hansen directed Davenport to write the August 20,

---

[5] "Let's try to keep the dentist in business so figure out what he is paying now and offer annual leases with a 3% escalator." Def. Ex. 17.

2015 letter to Dr. Bergano informing him that he was no longer a "displaced person." Notably, this letter of August 20, 2015, was the first correspondence from the director of public works, Mr. Davenport, to the Plaintiffs.

## II.     CONCLUSIONS OF LAW

The Court found the City liable to Plaintiffs but did not find the individual Defendants liable to Plaintiffs.

Municipalities are liable under 42 U.S.C. § 1983 ("§ 1983") when they follow a "custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." Owens v. Baltimore City State's Attorneys Office, 767 F.3d 379, 402 (4th Cir. 2014) (citing Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978)). A city's impermissible act can occur

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifests deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)). The policy or custom must be "(1) fairly attributable to the municipality as its 'own,' and [ ] (2) the 'moving force' behind the particular constitutional violation." Spell v. McDaniel, 824 F.2d 1380, 1386–87 (4th Cir. 1987) (citation omitted). The City has three policies affecting this case: (1) the City does not inform tenants of pending purchases of buildings when it wants those tenants to stay for the City's profit or convenience, (2) the City does not consider a business eligible for relocation assistance before it has physically moved prior to being notified not to relocate, and (3) the City regularly has paid dentist offices relocation expenses. The City enacted these policies through Deputy City Manager Hansen, who

13

had authority to implement final policy on behalf of the City on relocation issues.[6] Hansen signed the Possession Agreement with Dr. Bergano on behalf of the City, and he was ultimately responsible for the City's interaction with Plaintiffs. His policy decisions included when to inform Dr. Bergano about the pending purchase, deciding that the City could declare Plaintiffs not displaced because he had not physically moved, and refusing to pay Plaintiffs' relocation expenses. He also directed the actions of other individuals such as Mr. Lawson and Defendant Mr. Davenport. The injuries in this suit arise from Hansen's, Davenport's, and Salmon's implementation of City policy. Thus, City policy is the proximate cause and the "moving force" responsible for the injury to Plaintiffs, and the City is liable for those injuries.

Individual government officials are protected from liability under § 1983 by qualified immunity. They are not liable for discretionary actions within the scope of their authority as long as those actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As a result, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Defendants Davenport and Salmons acted within the scope of their authority and followed the policies of the City in their interactions with Plaintiffs. Neither violated clearly established law in their individual interactions with Plaintiffs because they were following City policy, which they did not understand to be unconstitutional at the time they acted. In fact, Mr. Davenport's letter of August 20, 2015 also followed the regulations in effect, basing eligibility for relocation benefits on the moving date. He also wrote that letter of August 20, 2015 at the direction of Deputy City

---

[6] The City Manager is the executive and administrative head of the City of Virginia Beach. See Charter, 1962 Va. Acts c. 147. He undoubtedly has the authority to implement final policy. Here, Deputy City Manager Hansen exercised the City Manager's authority to implement final policy in the City's interactions with Plaintiffs. See, e.g., Pl. Ex. 5 (where Hansen signs the Possession Agreement with the authority of the City Manager).

Manager Hansen. While the regulations and City policies were unconstitutional, as explained below, Davenport and Salmons acted in accordance with City policy. Thus, while the City is liable, Davenport and Salmons are protected by qualified immunity.[7]

The City is liable to Plaintiffs for the reasons stated below.

## A.    Procedural Due Process

The City violated Plaintiffs' procedural due process rights by failing to provide any notice, hearing, or appeal to Plaintiffs as to the denial of the requested relocation expenses and as to its later determination that Dr. Bergano did not qualify as a "displaced person."

Under the Due Process Clauses of the Fifth and Fourteenth Amendments, the government must provide a person with due process of law when acquiring his property. U.S. Const. amends. V, XIV. To succeed on a procedural due process claim, a plaintiff must demonstrate he (1) "had a constitutionally cognizable life, liberty, or property interest," (2) "the deprivation of that interest was caused by 'some form of state action,'" and (3) "the procedures employed were constitutionally inadequate." Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013) (quoting Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145 (4th Cir. 2009)) (requiring three elements to prove a procedural due process claim); Clear Sky Car Wash, LLC v. City of Chesapeake, Va., 910 F. Supp. 2d 861, 885 (E.D. Va. 2012) (requiring three elements to plead a procedural due process claim); see Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 826 (4th Cir. 1995).

---

[7] In addition, the Court must treat any liability for Davenport and Salmons in their official capacity as liability for the City rather than the individual defendants. See Kentucky v. Graham, 473 U.S. 159, 166 (1985). Thus, this Order discusses the City's liability as a whole without distinguishing official capacity liability for various City agents.

### i. Protected Interests

Plaintiffs demonstrated constitutionally cognizable property interests. A protected property interest is a legitimate claim of entitlement defined by existing statutes or other recognized rules. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). Plaintiffs have protected property interests defined by state law.

First, Plaintiffs are entitled to access to the building. The lease with the City requires the City "to use reasonable efforts to minimize any disruption to the Tenant's business (including access to, and visibility of, the Premises) caused by ongoing construction around the Premises." Pl. Ex. 5, ¶ 19. This contractual provision makes Plaintiffs' interest in access to the building protected by state law.

Second, Plaintiffs are entitled to access to parking. The City extended a commercial lease with Plaintiff, which it knew would necessitate access to parking. See id. ¶ 1. Thus, the lease makes Plaintiffs' interest in access to parking protected by state law.

Third, Plaintiffs are entitled to the suitability of the property for use as a dental office. The lease with the City states that Plaintiff's premises "shall be used as a dental office and for no other purpose." Id. The City's explicit restriction on Plaintiffs also binds the City by implication. See Fuller v. Laurens Cty. Sch. Dist. No. 56, 563 F.2d 137, 142 (4th Cir. 1977). Thus, the lease makes Plaintiffs' interest in the suitability of the property protected by state law.

Finally, Plaintiffs are entitled to relocation benefits under Virginia law. State statutes provide that displaced persons are entitled to relocation assistance from a state agency displacing them. See Va. Code § 25.1-400 et seq. The City also informed Plaintiffs of their eligibility for relocation assistance. Def. Ex. 48. Thus, Plaintiffs' have an interest in relocation benefits protected by state law.

*ii. State Action*

The City's actions deprived Plaintiffs of those property interests. The City modified access to the building and restricted the available parking. The City also added the five HSD sections to the Witchduck building that made it unsuitable for a dental practice. The City informed Plaintiffs in writing contained in the PA that they must relocate. See Pl. Ex. 5., ¶ B. It then refused to pay relocation benefits and subsequently declared that Plaintiffs were not eligible for relocation benefits. Def. Exs. 96, 111. Thus, the City's actions caused the deprivation of Plaintiffs' interests and were arbitrary and capricious.

*iii. Procedures Employed*

The City's procedures were constitutionally inadequate. The central meaning of procedural due process is the right to an opportunity to be heard and notice of that opportunity. Fuentes v. Shevin, 407 U.S. 67, 80 (1972); see United States v. Farmer, 274 F.3d 800, 803 (4th Cir. 2001). Courts measure the adequacy of procedural due process by a three factor test: "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the . . . administrative burdens that the additional or substitute procedural requirement would entail.' Farmer, 274 F.3d at 803 (quoting Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976)).

The private interests at issue, Plaintiffs' property interests, are at high risk of erroneous deprivation because the City failed to provide Plaintiffs with the central rights of procedural due process: notice and an opportunity to be heard. While never granted a hearing, Plaintiffs submitted an August 12, 2015 letter through counsel declaring an intent to appeal, Def. Ex. 100, and there is no evidence that the City ever responded to this letter. In addition, Plaintiffs'

17

counsel's August 19, 2015 letter requesting a date for time and place of an appeal was an unambiguous request for an appeal. Instead of granting the appeal or any other form of hearing, the City made this an adversarial process on August 20th when it sent a letter stating that Dr. Bergano was no longer considered displaced. A hearing should simply declare Plaintiffs' rights and attempt to make Plaintiffs whole if they have been damaged. The City's adversarial approach and lack of any hearing made the process of protecting Plaintiffs' rights unnecessarily difficult.

The papers that the City provided Plaintiffs offer no substitute for core procedural due process. The City's brochure is unclear as to how relocation benefits are calculated and awarded. See Pl. Ex. 7. For example, how would Plaintiffs have known they are entitled to the lesser of cost of moving the old equipment or buying new equipment? Furthermore, the City's brochure and VDOT attachments are unclear as to how a displaced person has to prove relocation expenses. See id. A hearing could have resolved these unclear statements by explaining those processes to Plaintiffs. The City's denial of a hearing, whether initial or through the requested appeal, denied Plaintiffs the opportunity to clarify their rights and reach a resolution with the City.

Federal regulations confirm the inadequacy of the City's processes here. Evidence at trial established that this project was funded by both federal and state money and thus subject to both sets of regulations. Federal regulations require that the notice denying relocation assistance describe the right to appeal that determination. 49 C.F.R. § 24.203(a)(5) (2017). Instead of providing that information in Plaintiffs' notice, the City relied on the appeal notice in the City's brochure on relocation assistance. Furthermore, the brochure was incorrect, as it described appealing a decision to VDOT in Richmond, which was not how the City conducted appeals.

The City's failure to explain the right to an appeal in the notice to Plaintiffs, and its failure to correctly explain the right anywhere, violated the processes that it was explicitly required to implement.

Plaintiffs' counsel's familiarity with cases of this type is also no substitute for providing notice and an appeal to Plaintiffs. Procedural due process requires notice to "a party with a property interest of the possible deprivation of that interest." Plemons v. Gale, 396 F.3d 569, 573 (4th Cir. 2005) (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 315 (1950)) (emphasis added). There is no exception to the notice requirement for parties who hire experienced counsel. Furthermore, creating such an exception would punish parties for hiring counsel. Plaintiffs did not lose the right to notice by hiring counsel familiar with these types of cases, and the City cannot rely on that familiarity as an excuse for failing to provide notice.

The City's letter of August 20, 2015 only increased the risk of erroneous deprivation, as it was inadequate to deprive Plaintiffs of their property interest in relocation assistance. The City argues that Plaintiffs are not entitled to relocation benefits because it denied their eligibility in writing pursuant to 24 Va Admin. Code 30-41-30 (2017).[8] The regulation provides, in relevant portion, that:

> Persons who do not qualify as a displaced person under these regulations include: . . . 5. A person who, after receiving a notice of relocation eligibility, is notified in writing that it would not be necessary to relocate. Such notice shall not be issued unless the person has not moved and VDOT agrees to reimburse the person for any expenses incurred to satisfy any binding contractual relocation obligations entered into after the effective date of the notice of relocation eligibility.

Id. While the City is correct that it followed the regulation to deprive Plaintiffs of their status as displaced persons, the Court **FINDS** that the regulation is unconstitutional as applied to these

---

[8] The City's original notice cited the corresponding federal regulation. See Def. Ex. 111. The City now argues for deference under the state regulation. Doc. 71 at 5. Since the text of both regulations is identical, the Court's conclusions are the same regardless of which regulation the City applied here.

facts and that its facial constitutionality is suspect. The Court further **FINDS** that Plaintiffs are displaced persons and entitled to relocation benefits under the Virginia statutes.

The City's application of the regulation is unconstitutional because it allowed the City to deprive Plaintiffs of relocation assistance at any time before Plaintiffs physically move property, regardless of how long Plaintiffs operated under the assumption that they will relocate. Proper notice is reasonably calculated to apprise a party of the pendency of its deprivation of property. Plemons, 396 F.3d at 573 (citing Mullane, 339 U.S. at 315). The City's letter of August 20, 2015 was not proper notice. The City could not reasonably tell Plaintiffs they had to move within twelve (12) months and eleven (11) months later declare that Plaintiffs could not move without adverse consequences. Professional businesses cannot possibly avoid incurring moving costs until their physical move date. The City contracted to buy the Witchduck building from Collier in July 2014 and knew how much property it would be using (and not leasing) such that it would not have needed to tell Plaintiffs that the City needed the entire building. See Def. Ex. 17. The City did not afford adequate procedural protections to Plaintiffs when it waited to tell them they did not have to relocate until August 20, 2015, after Hansen had remarkably authorized a year-long Possession Agreement with Plaintiffs to run from September 14, 2014 to September 15, 2015 referring to Plaintiffs having to relocate after he authored the July 17 e-mail stating the City did not need Dr. Bergano's office space. The City's notice to Plaintiffs that they needed to relocate, as well as the suitability and access issues at the Witchduck building, justified Plaintiffs' incurring relocation expenses. The lack of any notice or hearing on relocation assistance was a clear violation of procedural due process at the outset, and this eleventh hour letter notice of deprivation, without any hearing, is only further harm to Plaintiffs' procedural due process rights.

Furthermore, the City is not entitled to deference on this regulatory interpretation because it raises questions of Constitutional law. Courts generally defer to agencies on interpretations of their governing statutes and related regulations because such interpretations are within the specialized competence of the agency. See Manassas Autocars, Inc. v. Couth, 274 Va. 82, 87 (2007) (citing Commonwealth v. American Radiator & Standard Sanitary, 202 Va. 13, 19 (1960)). However, courts need not defer to agencies when their interpretation raises issues outside their special competence, such as issues of constitutional law. Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 243 (1988) (quoting Hi–Craft Clothing Co. v. NLRB, 660 F.2d 910, 914–15 (3d Cir.1981)); accord Miller v. Johnson, 515 U.S. 900, 923 (1995); see also Browning–Ferris Indus. v. Residents Involved in Saving the Env't, Inc., 254 Va. 278, 284 (1997) (noting that the court does not consider agency expertise in pure questions of law). Here, the City's unreasonable interpretation of the regulation raised issues of constitutional law. Thus, the Court accords the interpretation here little deference.

The Government's interest in reducing its administrative burden does not justify its approach here. The multiple letters and unclear brochure only exacerbated the situation with Plaintiffs by failing to clarify their rights. A non-judicial hearing with the City would have clarified relocation benefits to Plaintiffs much earlier, granted Plaintiffs their reasonable expenses, and avoided the need for this costly litigation. The City's opaque and hostile approach increased its burden in this case and caused harm to both Plaintiffs and to City resources. The Government's interest does not justify the complete lack of procedural due process granted to Plaintiffs.

Thus, the Court **FINDS** that the City violated Plaintiffs' procedural due process rights.

**B.      Equal Protection**

21

The City violated Plaintiffs' equal protection rights when it denied relocation assistance and arbitrarily and capriciously withdrew Plaintiffs' status as displaced persons. Under the Equal Protection Clause of the Fourteenth Amendment, the government must provide a person with equal protection of the laws. U.S. Const. amend. XIV. To succeed on an equal protection claim, a plaintiff must prove that (1) "he was treated different from others who were similarly situated" and (2) "that the unequal treatment was the result of discriminatory animus." Equity In Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 108 (4th Cir. 2011) (citing Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)). If he succeeds in proving those two elements, then the Court must determine whether the disparity in treatment is justified under the requisite level of scrutiny. Morrison, 239 F.3d at 654 (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439–40 (1985)). Unless the disparity is based on a suspect classification or affects a fundamental right, the treatment is presumed valid and will be sustained if rationally related to a legitimate state interest. Id.

The City treated Plaintiffs differently than other similarly situated persons. Mr. Collier, the previous owner of the Witchduck building, faced damage to his interests because of the City's purchase of his property. The City compensated him for his anticipated losses without any disagreement or adversarial reaction. Pl. Exs. 11, 12. In addition, Dr. Bergano was not the first dentist displaced by the City who faced costs of relocation. The City treated those dentists fairly, as when the City notified them of their eligibility for relocation assistance, it provided that assistance. Testimony at trial indicated that other dentists received payments for build out as well as for moving. The City treated Plaintiffs differently, regarding them as adversaries and using tortured interpretations of its own rules to deprive Plaintiffs of their benefits. After forcing Plaintiffs to incur the costs of relocating his business, the City attempted to deny the majority of

their relocations costs, and it then arbitrarily removed their displaced status in order to avoid paying such benefits. The payments to Mr. Collier and to other dentists indicate that the City does not routinely find ways to deny payment at the last minute. If the City had treated Plaintiffs like it treated others similarly situated, it would have worked cooperatively and paid reasonable relocation expenses. The City's attempted use of its own regulatory definition of "displaced person" to deny benefits to Plaintiffs treated them differently than others who were similarly situated.

The City also acted out of discriminatory animus toward Plaintiffs. While there is no evidence to support Plaintiffs' assertion that the City discriminated against Dr. Bergano on the basis of race, it appears from the evidence that the City did discriminate against Dr. Bergano because he obtained legal counsel regarding his rights. The City denied him relocation benefits and failed to apprise him of any rights related to that denial. Def. Ex. 96. The City even argued that it did not need to provide him notice of his appeal rights because of his counsel's familiarity with this type of case. The City's own assertions demonstrate that the City followed a different course of action with him because of his counsel. Thus, the City's unequal treatment of Plaintiffs was the result of discriminatory animus.

The City's actions, and its application of a regulation supporting its actions, are not rationally related to a legitimate state interest. A person who hires counsel is not a member of a suspect class or exercising a fundamental right, which means that the City's actions discriminating against such a person are presumed valid unless not rationally related to a legitimate state interest. Morrison, 239 F.3d at 654 The City does have a legitimate interest in the conservation of government resources. See Clear Sky Car Wash, 910 F. Supp. 2d at 888. Despite that interest, the Court **FINDS** that Plaintiffs successfully proved that the City's actions

were not rationally related to that interest.  Rather than apprising Plaintiffs of their rights and seeking to resolve any injury, the City increased its expenses by contesting Plaintiffs' claim at every turn.  The City knew or should have known that this obfuscation would make resolving Plaintiffs' claim more time-consuming and difficult, wasting government resources.  Instead of using a non-judicial hearing to give Plaintiffs the benefits to which they were entitled, the City continued the dispute, ultimately paying for counsel and for two expensive expert witnesses for a judicial hearing to reach a resolution that the City could have reached through a non-judicial hearing.  The City spent between $21,800 and $24,800 on two relocation experts for this case after refusing to pay more than a small fraction of that, $2,500, for a relocation expert to assist Plaintiffs. The City's adversarial treatment of Plaintiffs was a costly course of action and not rationally related to the City's interest in conserving government resources.

Thus, the Court **FINDS** that the City violated Plaintiffs' equal protections rights.

## C.    State Relocation Assistance

Because of the City's violation of Plaintiffs' constitutional rights and its unconstitutional application of a regulation, the City improperly denied state relocation assistance to Plaintiffs for their move to Corporation Lane.

The Parties also dispute whether Plaintiffs have a separate cause of action directly under Virginia law for relocation assistance.  "In adjudicating non-federal questions, a federal court must apply the law of the state." United States v. Little, 52 F.3d 495, 498 (4th Cir. 1995) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  Federal courts are bound by the state supreme court's interpretation of state law.  See id.; see also West v. Am. Tel. & Tel. Co., 311 U.S. 223, 236 (1940).  When the state supreme court has not ruled on an issue, federal courts must predict how the state's courts would resolve the issue.  See McClung v. Ford Motor Co.,

472 F.2d 240, 240 (4th Cir. 1973). The Virginia Supreme Court has no precedent on whether the state relocation assistance statutes provide a private right of action. Nevertheless, other states have found a private right of action under similar statutes when a municipality fails to implement state procedures. See Superior Strut & Hanger Co. v. Port of Oakland, 72 Cal. App. 3d 987, 1001 (Ct. App. 1977) (finding that when a municipality fails to provide adequate procedure for a state relocation assistance claim, a plaintiff may pursue original relief in court). The City stated in its relocation assistance brochure that its appeal process includes the Virginia Department of Transportation, see Pl. Ex. 7, but testimony at trial indicated that the City does not actually follow that procedure. Furthermore, beyond failing to offer an appeal hearing here, the City also failed to implement state appeal requirements such as transcribing appeals. See 24 Va. Admin. Code 30-41-90 (requiring a court reporter at appeals). These procedural failures may entitle Plaintiffs to judicial remedies directly under the act. Nevertheless, in the absence of Virginia state authority on point, the Court sees no reason to predict how the Virginia Supreme Court would handle these unusual facts when the other counts in the complaint reach the same damages.

Thus, because the City's violation of Plaintiffs' constitutional rights caused the failure to award reasonable relocation assistance, the Court will look to the state act for guidance in determining damages.

### III.    CONCLUSION

For the foregoing reasons, the Court **FOUND** the City liable to Plaintiffs for an amount of damages to be determined by the Court.

The Clerk is **REQUESTED** to deliver electronically a copy of this Opinion and Order to

all counsel of record.

    It is so **ORDERED**.

/s/

Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
March _10_, 2017

26